UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DONTIE S. MITCHELL,

                                     Plaintiff,

                                                              DECISION AND ORDER

                    -vs-
                                                              06-CV-6197

COMMISSIONER GLENN S. GOORD, *et al.,*

                                     Defendants.

**APPEARANCES**

For plaintiff:                        Dontie S. Mitchell, *pro se*
                                      98-A-0071
                                      Upstate Correctional Facility
                                      P.O. Box 2001
                                      Malone, NY 12953

For defendants:                       Benjamin A. Bruce, A.A.G.
                                      New York State Office of the Attorney General
                                      144 Exchange Boulevard, Suite 200
                                      Rochester, NY 14614

**Siragusa, J.** This matter is before the Court on plaintiff's application for a temporary restraining order and preliminary injunction. In that regard, plaintiff claims that the defendants are violating his First Amendment constitutional rights to free speech and freedom of association in connection with their confiscation of written materials he possessed relating to an organization called the New Afrikan [sic] Maoist Party and its affiliate, the new Afrikan [sic] Brigade. Additionally, in a supplemental filing, plaintiff seeks injunctive relief directing that he be released from the special housing unit ("SHU"), where he was placed as a penalty for his possession of the confiscated written materials.

Defendants oppose plaintiff's applications and maintain that their seizure of the written materials in question as well as the consequent penalty, were reasonably related to a legitimate penological interest. Specifically, defendants maintain that the written materials in question evidenced that plaintiff was possessing and attempting to distribute material from an unauthorized organization and was, in fact, engaging in unauthorized organizational activity. Further, defendants contend that such conduct on plaintiff's part was an attempt to circumvent the rational review process contained in Department of Correctional Services ("DOCS") Directive 4760,[1] which they assert meets the constitutional requirements for reasonableness pursuant to the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 89 (1987).

After hearing plaintiff's testimony in open court, and hearing oral argument by both sides, the Court determines that plaintiff is not entitled to the injunctive relief he seeks.

## STANDARD FOR MANDATORY INJUNCTIVE RELIEF

In most cases, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) "a likelihood of success on the merits" or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly" in the movant's favor. *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779-80 (2d Cir.1994) (quotation marks omitted); *Coca-Cola Co. v. Tropicana Prods.*, Inc., 690 F.2d 312, 314-15 (2d Cir.1982). Where a moving party challenges "'government action taken in the public interest pursuant to a statutory or regulatory scheme,'" however, the moving party cannot resort to the "fair ground for litigation" standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits. *Able v. United States*, 44 F.3d 128,

---

[1]As plaintiff correctly points out, the enforcement mechanism for DOCS Directive 4760 is DOCS Institutional Rule of Conduct 105.12.

131 (2d Cir.1995) (*per curiam*) (*quoting Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989)); see Catanzano v. Dowling, 60 F.3d 113, 117 (2d Cir.1995).

In some circumstances, an even higher standard applies. The moving party must make a "clear" or "substantial" showing of a likelihood of success where (1) the injunction sought "will alter, rather than maintain, the status quo"- i.e., is properly characterized as a "mandatory" rather than "prohibitory" injunction; or (2) the injunction sought "will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir.1995).

*Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

## FIRST AMENDMENT RIGHTS OF A PRISONER

The First Amendment provides as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

The First Amendment is made applicable to the states through the Fourteenth Amendment.

*School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 215-16 (1963); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Gitlow v. People of State of New York*, 268 U.S. 652, 666 (1925). A prisoner is not automatically stripped of his First Amendment rights by virtue of his incarceration. *See Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974); *Pell v. Procunier*, 417 U.S. 817, 822. As the Supreme Court held in *Pell*,

a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and

-3-

care the prisoner has been committed in accordance with due process of law.

*Pell*, 417 U.S. at 822. Further, the Supreme Court explained in *Turner*,

> when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union*, 433 U.S. [119], at 128 [1977]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. [396], at 407 [1974].

*Turner*, 482 U.S. 89.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court first determines that the highest standard for injunctive relief applies here. Not only is the regulatory action of a governmental entity being challenged, but plaintiff clearly seeks to alter the status quo. With the applicable standard in mind, the Court makes its findings of fact and reaches its conclusions of law.

## FINDINGS OF FACT

1.    Plaintiff possessed a list of inmate names and their department identification numbers;

2.    Plaintiff possessed extra copies of some of the literature confiscated by DOCS;

3.    The literature plaintiff possessed and that DOCS took included one labeled, "Charter

-4-

of the New Afrikan Brigade"; "Rules and Regulations of NAB"; "How can the NAIM/Maoist-wing benefit me: the question of the New Afirkan prisoner and ex-prisoner?";

4.      Plaintiff sent what DOCS called a "boomerang" letter[2] to another inmate in the same facility, through the organization called New Afrikan Maoist Party, by which plaintiff attempted to circumvent DOCS directives aimed at stopping unauthorized inmate-to-inmate correspondence.

5.      The Charter of the New Afrikan Brigade includes the following purpose: "The mission of the NAB is to identify, recruit, and train oppressed New Afrikans [sic], especially among lumpen youths and students, as potential cadres of NAMP." (Bruce Aff., Ex. 1 to Ex. A, at 16.)

6.      The Rules and Regulations for the NAB require that recruits recognize "the existence of the New Afrikan nation as an oppressed nation held in neocolonial and psyco-cultural bondage by the White settler nation, America, and its imperial government, the United States." (*Id*., at 19.) In addition, members are required to "[w]ork to be respectful and courteous to all people, regardless of race, color, or creed, even toward enemy foot soldiers and lackeys." (*Id*., at 20.) Members are also required to, "[r]eport immediately to senior member about any encounter with enemy agents or police, and contact other members if locked down so that adjustments and plans can be made." (*Id*., at 20.) In a question and answer format, entitled "Political Lesson - The New Afrikan Nation," the written materials advocate the creation of a "politically independent nation on land in America with Our own government," the land being identified as "the five Black Belt states of Alabama, Georgia, Louisiana, Mississippi and South Carolina . . . . We would call this combined territory and Our government upon it the People's Socialist Republic of New Afrika." (*Id*., at 27-28.)

7.      The Constitution of the New Afrikan Maoist Party requires new Afrikans to "carry out and uphold the discipline and decisions of Our Party, as reflected in Our resolutions, mandates, policies, rules and regulations.…" (*Id*., at 36.) The party constitution also requires cadres "to distribute NAMP literature and generally aid Our Party in Our propaganda work." (*Id*., at 37.)

---

[2]A "boomerang" letter is described by DOCS as inmate-to-inmate correspondence via a third party. That is, the inmate sends his letter to a third party who is asked to readdress the correspondence, forwarding it to another inmate in the same facility.

8.   DOCS Directive 4760 requires that a prisoner desiring to start an inmate organization seek authorization from DOCS through the application process described in the directive.

9.   Plaintiff was familiar with DOCS Directive 4760 on Inmate Organizations and did not comply with the Directive.

## CONCLUSIONS OF LAW

1.   Based on its findings of fact, the Court concludes that plaintiff's has failed to make a "clear" or "substantial" showing of a likelihood of success with respect to his claim that the possession of materials in question was *not* for the purpose of forming an inmate organization and in contravention of DOCS's legitimate penalogical policy.

2.   Therefore, the Court concludes that plaintiff has not made a clear or substantial showing that the seizure of the written materials at issue was in violation of his First Amendment rights and that the SHU penalty imposed flowed from such violation.

## CONCLUSION

Accordingly, plaintiff's motions for a temporary restraining order and preliminary injunction (# 18-1) are denied in all respects. His motions to amend his complaint (# 18-3) and for assignment of counsel (# 18-5) will be handled by U.S. Magistrate Judge Marian W. Payson. This Court will set a separate briefing schedule for plaintiff's motion for class certification pursuant to Federal Rule of Civil Procedure 23 (# 18-4).

IT IS SO ORDERED.

Dated:   March 22, 2007
          Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge